13217

HUGHES v. BLACKWELL *ET AL.*

(159 S. E., 785)

*Mr. John I. Cosgrove,* for petitioner.

*Messrs. R. M. Figg, Jr., G. L. B. Rivers* and *James Fromberg,* for respondents.

August 3, 1931.

The opinion of the Court was delivered by MR. JUSTICE BONHAM.

A special election was held May 26, 1931, in the County of Charleston for the election of a member of the County Board of Education. The County Board of Canvassers declared Maeir Triest elected. It appeared on the face of the returns that Samuel Hughes had 739 and Maeir Triest 758 votes. When the county board assembled to canvass the returns and declare the result of the election, Samuel Hughes filed a protest and contest of the election on the ground that 42 persons had been allowed to vote who had not paid their poll tax thirty days before the election; that this number was more than enough to have changed the result of the election. At the same time Maeir Triest filed a protest

against receiving and counting the votes in precinct 1 in ward 3, and precincts 1 and 2 in ward 5, on the ground that illegal votes were allowed to be cast in these precincts.

Petitioner, Hughes, supported his protest by an affidavit signed by W. W. North, J. T. Piggot, and Q. P. Brooks, which set forth that they had checked the tax records of the County Treasurer of Charleston County, which showed that forty-two persons who had voted in this election had not paid their poll taxes thirty days before the election.

Maeir Triest supported his protest by the affidavits of nine persons whose names appeared on the poll lists of the protested precincts as having voted at the election, to the effect that they had not so voted, and the sworn certificate of the health officer of the City of Charleston to the effect that one person whose name appeared on the protested poll lists as having voted had died before the election.

The County Board of Canvassers threw out the boxes in which the illegal votes were cast, and declared the result of the election as follows: Maeir Triest, 742 votes; Hughes, 588 votes; Strohecker, 691 votes. Mr. Strohecker is not concerned in this contest. Mr. Dorman, a member of the county board, filed a minority report, holding that, if there were illegal votes cast in the precincts named, there were more illegal votes cast in other precincts (presumably these are the 42·voters who it is alleged had not paid their poll taxes); he therefore held that the election should be declared null and void.

Mr. Hughes appealed to the State Board of Canvassers on the ground that it was error for the county board to throw out the boxes contested by Mr. Triest; that, if it was legal to throw out these boxes, then the board should have thrown out the boxes in which the 42 voters who had not paid their poll taxes had voted; that it was error to throw out any of the boxes in wards 3 and 5 because the illegal votes could have been eliminated, and the legal votes counted.

The State Board of Canvassers dismissed the appeal and confirmed the report of the majority of the County Board of Canvassers, without assigning the grounds of their decision.

Thereupon the petitioner obtained from the Hon. Jesse F. Carter, Associate Justice of the Supreme Court, a writ of *certiorari*, which commanded these respondents to certify and return unto the Supreme Court on the 13th day of July, 1931, the entire record of the proceedings on appeal to the said Board of State Canvassers from the County Board of Canvassers, together with their findings and decision and that of the county board.

The matter came on for hearing by this Court on the day named.

The respondent moved to quash the writ of *certiorari* on the ground that it was improvidently issued, in that no error of law appears upon the face of the record of the proceedings and the action of the state canvassers sought to be reviewed, so that the Supreme Court is without jurisdiction to entertain said writ.

Technically, strictly speaking, the position of respondents may be correct. But it is difficult to separate in this proceeding the issues of fact and law. Therefore the Court prefers to decide the case on the issues made.

The essential questions are these: Was it error for the County Board of Canvassers to throw out the boxes in which the illegal votes were cast? Was it error for the board to disregard the contest of the petitioner which was based on the allegation that 42 persons had voted who had not paid their poll taxes?

The record is incomplete in many respects. It does not appear for whom these illegal votes were cast in wards 3 and 5. It is patent that the boxes could not be purged by casting out these illegal votes. In the interest of a fair election, there was nothing the board could do but cast out the boxes thus tainted with fraud.

"When the polls can be purged of the illegal votes, this should be done, and only the illegal votes should be rejected, and the legal votes should be counted. But when this cannot be done, the entire polls must be thrown out, if it appears that enough illegal votes have been cast to affect the result at such poll, or to leave it in doubt." *State v. State Board of Canvassers,* 86 S. C., 451, 68 S. E., 676, 678.

But the issue here is otherwise determinable. If these six illegal votes (that is, the number stated by petitioner), had been thrown out and deducted from the vote of Maeir Triest, it would not have affected the result of the election, unless petitioner's position that the 42 votes of those who had not paid their poll taxes, should also be deducted from Triest's vote, or those boxes thrown out and the election declared void.

It appears from the record that on the face of the returns petitioner had 739 votes and Triest 758. If the six admittedly illegal votes had been deducted from Triest's vote, the result would have been Hughes, 739; Triest, 752. If ten illegal votes had all been deducted from Triest, the result would have been Hughes, 739; Triest, 748. So that the action of the board in throwing out the boxes in which the illegal votes were cast did not affect the result of the election, unless the votes of those who had not paid their poll taxes were also deducted from Triest's vote, or were held to be sufficient evidence of fraud to vitiate the whole election.

It is the law that no one may legally vote at a general ▮▮▮ or special election, who has not paid his poll tax for the preceding year; provided, he is liable for poll tax. Those who have reached the age of 65 years are not liable; those who are unable to earn a living are exempt.

In the affidavit upon which petitioner relies to have thrown out 42 votes, or to declare the whole election null and void, it is alleged that the affiants have "checked the tax records of the County Treasurer of Charleston County and

find no payment of 1930 poll tax prior to April 26, 1931, by the following persons"—naming 42.

There is no proof that the persons named are within the age limit which subjects them to a payment of poll tax; no proof that they are not exempt by their infirmities from liability of payment; no certificate or affidavit from the county treasurer that these persons are liable to pay and had not paid a poll tax. What records of the county treasurer's office were "checked" by these affiants? It does not appear.

Surely this is wholly inadequate proof upon which to throw out the votes of these 42 persons, or upon which to declare the whole election null and void.

What proof is there that if these votes were thrown out it would affect the result? There is no evidence to show for whom these persons voted.

We might well have held as was held in *Rawl v. Mc-Cown*, 97 S. C., 1, 81 S. E., 958, 963: "As there was evidence to support this finding [of the county board], which was concurred in by the state board, the question is not reviewable here."

But the zeal and evident sincerity of counsel for the petitioner inclined us to forego the strict rule and hear the appeal on its merits.

We are satisfied that the petition should be dismissed. It is so ordered.

Mr. Chief Justice Blease and Messrs. Justices Cothran, Stabler and Carter concur.